AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)          ☐ Original  ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
for the
Central District of California



FILED
CLERK, U.S. DISTRICT COURT

JUN 27 2023

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

United States of America

v.

MICHAEL ANTHONY FAROLE, aka "Michael Alexai Dragunov," aka "Michael Dragunov," aka "Michael Farole," aka "Michael Le Fleur," aka "Michael Anthony Le Fleur," aka, "Michael LeFleur," aka "Michael LeFleur Dragunov," aka "Gene Andrew," aka "James Harper," aka "Steven Jackson," aka "James Logan," aka "Jonathan Martin," aka "John Morgan," aka "Kevin Parker," aka "Jason Ramone," aka, "Vic Romano," aka "Victor Romano," aka "Christopher Stevens," aka "Jonathan Williams," and
CHRISTOPHER MICHAEL LANG, aka "Christopher Lang," aka "Chris Lang," "Scott Graham," aka "Don Lewis," aka "Anthony Parker,"
Defendant(s)



LODGED
CLERK, U.S. DISTRICT COURT

6/27/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ CD _____ DEPUTY

Case No.   2:23-mj-03217-DUTY

# CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Beginning no later than on or about August 28, 2013, and continuing until at least on or about June 20, 2023, in

the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1349 | Conspiracy to Commit Wire Fraud |

This criminal complaint is based on these facts:
*Please see attached affidavit.*

☒ Continued on the attached sheet.

*/s/ Young Oh*
*Complainant's signature*
Young Oh, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   6/27/2023

*Judge's signature*

City and state:   Los Angeles, California

Hon. Jacqueline Chooljian, U.S. Magistrate Judge
*Printed name and title*

AUSA: Julia Hu (x3802)

**AFFIDAVIT**

I, Young Oh, being duly sworn, declare and state as follows:

### I.    PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint and arrest warrants against MICHAEL ANTHONY FAROLE, also known as ("aka") "Michael Alexai Dragunov," aka "Michael Dragunov," aka "Michael Farole," aka "Michael Le Fleur," aka "Michael Anthony Le Fleur," aka, "Michael LeFleur," aka "Michael LeFleur Dragunov," aka "Gene Andrew," aka "James Harper," aka "Steven Jackson," aka "James Logan," aka "Jonathan Martin," aka "John Morgan," aka "Kevin Parker," aka "Jason Ramone," aka "Vic Romano," aka "Victor Romano," aka "Christopher Stevens," aka "Jonathan Williams" ("FAROLE") and CHRISTOPHER MICHAEL LANG, aka "Christopher Lang," aka "Chris Lang," "Scott Graham," aka "Don Lewis," aka "Anthony Parker" ("LANG") for a violation of 18 U.S.C. § 1349 (conspiracy to commit wire fraud).

2.    This affidavit is also made in support of an application for warrants to search the following:

a.    11347 Mississippi Ave, Los Angeles, CA 90025 ("SUBJECT PREMISES 1"), as described more fully in Attachment A-1;

b.    Two storage units at Public Storage, 11259 Olympic Blvd., Los Angeles, CA 90064, as described more fully in Attachment A-2:

i.    Unit No. 3014 ("SUBJECT PREMISES 2"); and

ii.    Unit No. 1167B ("SUBJECT PREMISES 3").

c.    A 2019 gray Mercedes G550 SUV, bearing California license plate number 8ECL730 and vehicle identification number ("VIN") WDCYC3KH7JX290920 ("SUBJECT VEHICLE 1"), as described more fully in Attachment A-3;

d.    A 2022 Mercedes Benz SL55 AMG convertible, bearing California license plate number 9GJS579 and VIN W1KVK8AB1NF003921 ("SUBJECT VEHICLE 2"), as described more fully in Attachment A-4;

e.    A 2016 Harley-Davidson motorcycle, bearing California license plate number 21V6235 and VIN 1HD1HHH3XGC800466 ("SUBJECT VEHICLE 3"), as described more fully in Attachment A-5; and

f.    The person of FAROLE, as described more fully in Attachment A-6.

3.    The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 1001 (false statements), 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1344 (bank fraud), 18 U.S.C. § 1349 (fraud conspiracy), 18 U.S.C. §§ 1956, 1957 (money laundering and money laundering conspiracy), 18 U.S.C. § 2326(2) (telemarketing fraud against the elderly), 26 U.S.C. § 7201 (tax evasion), 26 U.S.C. § 7206 (false statement on tax document), and 26 U.S.C. § 7207 (fraudulent tax document) (collectively, the "Subject Offenses"), as described more fully in Attachment B. Attachments A-1, A-2, A-3, A-4, A-5, A-6, and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested complaint, arrest
warrants, and search warrants, and does not purport to set forth
all of my knowledge of or investigation into this matter.
Unless specifically indicated otherwise, all conversations and
statements described in this affidavit are related in substance
and in part only, and all dates and times are approximate.

## II.    BACKGROUND OF AFFIANT

5.    I am a Special Agent with the Federal Bureau of
Investigation ("FBI") and have been so employed since July 2004.
I am currently assigned to a Los Angeles Field Division White
Collar Crimes Squad, which is responsible for investigating
financial institution fraud, including bank fraud and wire
fraud.  Prior to working for the FBI as a special agent, I was
employed as a field auditor with the Department of Real Estate.
As a special agent with the FBI, I have investigated financial
crimes, including wire fraud, money laundering, bank fraud, and
financial institution fraud.  I have participated in numerous
aspects of criminal investigations, including interviews,
reviewing evidence, conducting physical and electronic
surveillance, and the execution of search and arrest warrants.
I have received advanced training in investigating crimes, such
as bank fraud, money laundering, and other financial frauds.  In
addition, I attended New Agent Training at the FBI Academy in

Quantico, Virginia where I received extensive instructions in
FBI core mission areas, legal authorities, search and arrest
techniques, and criminal intelligence.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

6.    FAROLE and LANG, along with other co-conspirators,
have perpetuated a decade-long nationwide conspiracy to defraud
elderly victims through telemarketing.  Specifically, FAROLE and
LANG purported to represent companies who provided advertising
and other services to current or former timeshare owners.
FAROLE and LANG represented that they could secure rental or
sale of the victims' timeshares and the resulting proceeds would
be delivered to the victims in exchange for advance fees.
Despite the recurring fees that each victim paid, often reaching
the hundreds of thousands over several years, none received the
timeshare-related services or proceeds promised.

7.    FAROLE and LANG controlled the companies' bank
accounts, into which victim funds were deposited.  FAROLE and
LANG enriched themselves from these proceeds in the form of cash
withdrawals, luxury goods, luxury travel (including FAROLE's
recent trip to Italy), cars, boats, RVs, mortgage payments, and
rent payments.  No legitimate business expenses are apparent
from the companies' bank accounts.

8.    FAROLE lives at **SUBJECT PREMISES 1**, as confirmed by
surveillance, GPS location data for his personal phone, bank
records, and IP address data.  According to DMV records and
surveillance, FAROLE owns the **SUBJECT VEHICLES**.  FAROLE also

rents storage lockers, which are **SUBJECT PREMISES 2** and **SUBJECT PREMISES 3.**

### IV.    STATEMENT OF PROBABLE CAUSE

9.    Based on FBI interviews, my review of bank records, telephone toll records, victims' handwritten journals of their telephone communications with FAROLE, LANG, and co-conspirators, audio recordings, law enforcement reports, trash covers, open-source information, and my participation in this investigation working jointly with a Special Agent of the Internal Revenue Service – Criminal Investigations ("IRS-CI"), I know the following:

### A.    Overview of the Timeshare Telemarketing Scheme

10.    Beginning no later than August 28, 2013, and continuing until at least June 20, 2023, FAROLE and LANG conspired with T.V., K.M., Th.M., T.T., and known and unknown co-conspirators (collectively, the "Conspirators") to engage in nation-wide fraudulent advance fee timeshare telemarketing scheme.  Their scheme targeted elderly victims, ages ranging between 55 and 90 years old, that currently or formerly owned timeshares and vacation rental memberships.

11.    In their communications with victims, the Conspirators purported to represent Premier Marketing, LLC ("Premier Marketing"), Paramount Media, LLC, aka Paramount media LLC ("Paramount Media"), CML Marketing Specialists, LLC ("CML Marketing"), Dissonance Entertainment Inc. ("Dissonance Entertainment"), Condo Rental Associates, LLC ("Condo Rental Associates", and Condo Owners Network, LLC ("Condo Owners

Network") (collectively, the "Telemarketing Companies"), which are described in greater detail below.  After one company's reputation became tarnished after bank investigations and consumer complaints, the Conspirators would start new companies and bank accounts.

12.  FAROLE and LANG contacted victims through Microsoft Skype calls and text messages to collect advance fee payments from the victims under false representations and promises to sell and/or rent out their timeshares.  FAROLE also directed victims to withdraw funds from their savings and retirement accounts to pay for the advance fees and told the victims to lie to their banks about the purpose of their withdrawals.

13.  The Conspirators would initiate contact with the victims.  Based on victim interviews and documents, it appears that the Conspirators offered victims an assortment of lies and misrepresentations.

a.  Primarily, victims who were current timeshare owners were promised that they would receive proceeds from the rental or sale of their timeshares by the Telemarketing Companies.  The Conspirators would offer advertising and marketing services of the victims' timeshares in return for certain fees, such as advertising or service fees, leading victims to believe that their timeshare was being advertised for sale and/or rental.  To induce payments from the victims, the Conspirators asked for payment of the fees in advance.

b.  The Conspirators also targeted former timeshare owners and convinced them that they still owned their timeshares

when in fact the properties had already been sold or disposed of.  In these cases, the Conspirators represented that the Telemarketing Companies had recovered money on behalf of the victims because the prior sales of their timeshares were invalid or that the Telemarketing Companies could reverse deeds transferring ownership of the timeshare properties that had already been executed, if the victims paid fees in advance.

14.  After collecting initial fees from the victims, the Conspirators continued to contact the victims to solicit additional payments.  These subsequent payments were collected under various false pretenses, such as that additional fees were required before a deal could be closed because the victims still owed taxes related to their timeshare properties or the properties had liens on the deeds, the additional "holding fees" being requested would be refunded once a sale and/or rental was finalized, and that a deal had fallen through such that additional marketing was needed.

15.  Despite paying the hefty fees requested by the Conspirators, which often accumulated over several years in the hundreds of thousands, none of the victims interviewed to date appear to have received the services or sale/rental proceeds promised by the Conspirators.  Based on the investigation to date, the Conspirators defrauded over 370 victims residing in various states in the United States of over $4.5 million of their savings, retirement funds, and social security income.

16.  As discussed below, FAROLE, LANG, and other co-conspirators controlled the Telemarketing Companies' bank

accounts, into which victim funds flowed.  Based on my review of those records, no legitimate business expenses are apparent from the bank records.  Instead, FAROLE and LANG used victim funds for self-enrichment, including buying houses, cars, boats, RVs, ATVs, luxury goods, and luxury travel expenses.

**B.    Overview of the Conspirators**

1.    <u>FAROLE Is the Leader of the Conspiracy</u>

17.    As detailed below, FAROLE incorporated many of the Telemarketing Companies and controlled many of the Telemarketing Companies' bank accounts.  According to FAROLE's IRS records, bank records, and law enforcement databases, FAROLE has not held a job outside of the Telemarketing Companies for the duration of the conspiracy.  California EDD records reveal that FAROLE does not have any wages.

18.    FAROLE has many aliases.  Based on my training and experience, I know that it is common for fraudsters to use aliases to avoid detection and facilitate their escape in case of law enforcement action.  I know the following based on DMV records, IRS records, financial records, and Instagram records:

a.    "Michael Anthony Farole" ("Farole Identity") appears to be FAROLE's original name.  In 2010, the Florida DMV issued a driver's license in the "Farole" identity.  In September 2015, the California DMV issued a driver's license in the Farole Identity.  The birthdate and other personal identifying information on these licenses match.  As detailed below, FAROLE filed an IRS Offer of Compromise in August 2022 using the Farole Identity and his Florida address.

b.    According to a Los Angeles Superior Court decree dated January 15, 2016, FAROLE changed his name from "Michael Farole" to "Michael Le Fleur" ("Le Fleur Identity").  On January 20, 2016, the California DMV issued a California driver's license in the Le Fleur Identity.  As detailed below, FAROLE provided copies of both the "Farole" and "Le Fleur" California driver's licenses to a check cashing business in Sherman Oaks, CA.  Both licenses contained photos that appeared to depict the same white male with same birthdate and physical descriptions.

c.    On February 28, 2022, FAROLE obtained a California driver's license in the name of "Michael Alexai Dragunov" ("Dragunov Identity").[1]  As detailed below, FAROLE provided a California license in the Dragunov Identity when making purchases at Cartier.  The DMV photo, birthdate, and personal identifiers match the Farole and Le Fleur Identities. During a search on Instagram, I found a public Instagram profile with username "michaeldragunov_" ("Dragunov Instagram") in the Dragunov Identity.  Photos posted on the Dragunov Instagram as recently as June 2023 depict the same person as the California DMV photos of Farole, Le Fleur, and Dragunov.

d.    According to victim interviews and documents, FAROLE used a swath of other aliases when calling victims, including "Gene Andrew," "James Harper," "Steven Jackson," "James "Logan"," "Jonathan Martin," "John Morgan," "Kevin Parker," "Jason Ramone," "Victor Romano," "Christopher Stevens,"

---

[1] In early 2023, an FBI employee went to the Los Angeles Superior Court to obtain official name change records for the Dragunov identity.  None were found.

and "Jonathan Williams."  Multiple victims recounted that the voices from the different names calling them sounded the same. As detailed below, despite these fake names, I believe FAROLE was the caller because the calls came from Skype phone numbers and IP addresses belonging to FAROLE, **SUBJECT PREMISES 1,** and other addresses associated with FAROLE.

    2.   <u>LANG Worked Closely with FAROLE to Defraud Elderly Victims</u>

    19.  As detailed below, LANG incorporated one of the Telemarketing Companies, CML Marketing, and was the signatory on its bank account.  LANG also represented on several credit applications that he worked at least three of the other Telemarketing Companies.

    20.  According to Microsoft records and victim interviews detailed below, LANG operated a Skype account tied to several phone numbers from which many victims said they received calls and which appear on credit applications that LANG filled out in his name.  On these calls, LANG used various aliases, including "Scott Graham," ""Don Lewis," aka "Anthony Parker."  IP addresses for many of the Skype calls to known victims come back to LANG's current residence, 506 W. 35th St, Hays, Kansas 67601 ("Lang Residence").

    3.   <u>IP Addresses Tied to FAROLE and LANG</u>

    21.  Based on my training and experience, I know that an Internet Protocol address ("IP address") is a unique address that identifies a device on the internet or a local network and

can be used to estimate the location of a device based on the IP
address range that is assigned to a particular geographic area.

//

//

22. According to records from the below internet service
providers, FAROLE and LANG used the following IP addresses:

| Subscriber | IP Address | Location | ISP | Date Range | Hereinafter |
|---|---|---|---|---|---|
| FAROLE | 104.180.13.186 | 1600 Vine St. Apt 1143, Los Angeles, CA[2] | AT&T | 4/15/2021 to 6/24/2021 | "Farole Vine IP" |
| FAROLE | 104.172.30.73 | 4117 Vantage Ave, Studio City, CA[3] | Charter | 6/22/2019 to 9/1/2020 | "Farole Vantage IP" |
| FAROLE | 47.156.154.160 | **SUBJECT PREMISES 1** | Frontier | 8/21/2022 to 9/18/2022 | "Farole Home IP" |
| LANG | 198.210.100.172 | Lang Residence | Nex-Tech | 5/15/2021 to 7/1/2021 | "Lang Home IP" |

4. <u>Key Cell Phone Numbers Tied to FAROLE and LANG</u>

23. According to Verizon Wireless records, FAROLE has been
the subscriber of Verizon Wireless telephone number, 1-310-660-
0192 ("Farole 0192 Number") since 2013. Verizon Wireless
monthly billing statements from December 2013 to August 2022 for
Farole 0192 Number were addressed as follows:

a. From December 2013 to mid-September 2014, to
FAROLE at 1619 North La Brea Avenue, Apt. 416, Hollywood,
California 90028-6468 (the "North La Brea Address").

---

[2] According to lease records, FAROLE leased the Vine Street
apartment from February 2021 to May 2022.

[3] According to bank records, FAROLE paid monthly rent on the
Vantage Street address from April 2020 to April 2022.

b.    From mid-September 2014 to mid-March 2022, to FAROLE at 11989 Laurelwood Drive, Apt. 5, Studio City, California 91604-3770 (the "Laurelwood Drive Address").

c.    From mid-March 2022 to August 2022, to the Dragunov Identity at the Laurelwood Drive Address.

24.    According to GPS location data provided by Verizon Wireless,[4] Farole 0192 Number has been consistently located at or near **SUBJECT PREMISES 1** from March to June 2023.

25.    LANG provided 407-766-4120 ("Lang 4120 Number") as his phone number in various documents, including in Wells Fargo and Bank of the West bank records, a Bank of the Ozarks credit application dated April 28, 2018, an Eddy's Chevrolet – Cadillac LLC purchase agreement dated November 23, 2018, a borrower contract with Tinker Federal Credit Union dated August 15, 2020, and an application for roadside assistance with RV Complete dated April 15, 2022.

5.    Key Skype Numbers Tied to FAROLE and LANG

26.    As detailed below, FAROLE and LANG used Microsoft Skype Voice over Internet Protocol ("VoIP") numbers to contact victims.  When victims receive a call from a phone number tied to a Skype account, it will appear to be a standard phone

---

[4] On March 17, 2023, the Honorable Alicia G. Rosenberg, United States Magistrate Judge, issued a GPS ping location warrant for Farole Number 1 through May 1, 2023.  Case No. 23-MJ-1276.  On May 1, 2023, the Honorable Alexander F. MacKinnon, United States Magistrate Judge, issued a continued GPS ping location warrant for the same phone number through June 15, 2023.  On June 15, 2023, the Honorable Karen L. Stevenson, United States Magistrate Judge, issued a continued GPS ping location warrant from the same phone number.

number.  Based on my training and experience, I know that
fraudsters will use VoIP numbers when contacting victims to
avoid detection and hide their identity.

27.  FAROLE is believed to be the user of Skype telephone
numbers, 1-518-712-7316 ("Farole 7316 Number") and 1-347-227-
2199 ("Farole 2199 Number") based on the following:

a.  According to Microsoft records,[5] Farole 7316
Number was created on September 23, 2019, using Farole Vantage
IP and name "Vic Romano."  Based on my knowledge of the
investigation, "Vic Romano" and "Victor Romano" are aliases that
FAROLE used.

b.  FAROLE provided Farole 2199 Number as his contact
information when opening a PayPal account in his name and Stripe
accounts for Paramount Media.[6]

28.  LANG is believed to be the user of Skype telephone
numbers 1-954-289-4117 ("Lang 4117 Number"), 1-213-438-9956
("Lang 9956 Number"), 1-618-627-7400 ("Lang 7400 Number"), and
1-518-712-7306 ("Lang 7306 Number") based on the following:

a.  According to Microsoft records, the user of Lang
4117 Number created a Skype account on January 24, 2010, using
IP address 67.8.118.0.  The account is registered to email

---

[5] On June 25, 2021, the Honorable Jean P. Rosenbluth, United
States Magistrate Judge, signed an order pursuant to 18 U.S.C.
§ 2703(d) directing Microsoft to disclose certain records.  Case
No. 21-MJ-3030.  On September 12, 2022, the Honorable Charles
Eick, United States Magistrate Judge, signed an order pursuant
to 18 U.S.C. § 2703(d) directing Microsoft to disclose certain
records.  Case No. 22-MJ-3626.

[6] Microsoft records for Farole 2199 Number are pending.

address Clang00@me.com ("Lang Email 1"), which belongs to LANG
for the reasons identified below, and username "resortadv."

        b.    As detailed below, LANG made numerous Skype calls
to known victims including B.C., D.A., and R.S.  At least 30 of
these calls were from Lang Home IP according to Microsoft
records obtained to date.

        c.    Microsoft records show that when victims dialed
Lang 9956 Number, Lang 7400 Number, or Lang 7306 Number, the
calls were routed to the same Skype account as Lang 4117 Number.
This indicates that these phone numbers all belong to LANG.

        6.    Email Addresses

        29.   Email addresses that appear to belong to FAROLE and
LANG appear on various company documents, documents provided by
victims, financial records, and Microsoft records.

        30.   According to records provided by Microsoft,
custservparamount@hotmail.com ("Farole Email 1") is registered
to "Victor Romano," and was created in April 2020.  Again,
"Victor Romano" is an alias for FAROLE.  As detailed below,
Farole 0192 Number was in the close vicinity of **SUBJECT PREMISES
1** when victim L.W. received an email from Farole Email 1 on May
22, 2023.

        31.   FAROLE appears to use vrodmuscle2011@hotmail.com
("Farole Email 2").  As detailed below, FAROLE provided Farole
Email 2 as his contact email address when renting private
mailboxes associated with Paramount Media, in a check cashing
application, and as his contact email address for a PayPal
account in his name.

32.  FAROLE appears to use lefleurfit@hotmail.com ("Farole Email 3").  As detailed below, FAROLE used Farole Email 3 as his contact email address for a Chase bank account where he is the signatory, as his contact email address for his public Instagram account handle, m-Lefleur, and as his contact email address for a PayPal account in his name.

33.  LANG appears to use Lang Email 1.  LANG provided Lang Email 1 as his email address in various documents that he signed, including a Tinker Federal Credit Union financing agreement dated August 15, 2020, a Ford Motor Credit Company application dated August 14, 2021, and a Bank of the West credit application dated April 12, 2022.

**C.   FAROLE Exchanged Thousands of Calls with LANG and Other Co-Conspirators**

34.  Verizon Wireless records shows substantial call volume between FAROLE, LANG, and other co-conspirators.  Based on my training and experience, I know that fraudsters frequently communicate over the phone rather than through written communication to avoid detection.

35.  From 2015 to 2022, Farole 0192 Number exchanged approximately 9,824 calls with Lang 4120 Number.

36.  From 2015 to 2020, Farole 0192 Number exchanged approximately 8,978 phone calls with a phone number belonging to T.V.

37.  From 2015 to 2017, Farole 0192 Number exchanged approximately 365 calls with a phone number belonging to K.M.

### D.   The Conspirators Used the Telemarketing Companies to Execute the Fraudulent Scheme

38.   FAROLE, LANG, and other co-conspirators ran the Telemarketing Companies, which were incorporated between August 28, 2013, and August 3, 2022.  When one company became tainted by a bank fraud investigation and/or consumer complaints, the Conspirators would start a new company and bank accounts.

39.   Information obtained thus far in the investigation suggests that the Telemarketing Companies are linked.  For one, victims recounted receiving calls from the same caller who purported to be calling from different Telemarketing Companies.  Moreover, where FAROLE's name was not on a company's official incorporation documents, as detailed below, FAROLE controlled private mailboxes in the Los Angeles area that received victims' checks in the mail for those companies.  In addition, bank records detailed below show transfers between the Telemarketing Companies.

40.   Although the Conspirators formally incorporated the Telemarketing Companies, little else about them appears legitimate.  The bank accounts in the Telemarketing Companies' names that received victim funds reflect only personal spending and transfers by the Conspirators and little to no legitimate business expenses.

41.   Documents filed with Secretaries of State where the Telemarketing Companies were incorporated, information found on OpenCorporates.com, and bank records revealed the following details.

    1.   <u>FAROLE and LANG Worked at Premier Marketing</u>

42.  FAROLE incorporated Premier Marketing, LLC, with entity number 201324710297 in California on August 28, 2013, via LegalZoom.com, Inc.  FAROLE was the registered manager or member for Premier Marketing and the company's registered address is the North La Brea Address.  The business description was "Advertising and Marketing online."

43.  According to OpenCorporates.com, Premier Marketing was suspended on June 1, 2018.

44.  A Statement of No Change filed with the California Secretary of State on February 14, 2020, shows FAROLE using the LeFleur Identity as the CEO of Premier Marketing.

45.  FAROLE has represented in multiple documents that he signed that he worked for Premier Marketing.  For example, in an apartment lease application with 1600 Vine Street dated February 21, 2021, that FAROLE filled out under the Le Fleur Identity, FAROLE stated in the "Previous Employment Information" section that he had previously worked at "Premier Marketing" from January 10, 2006, to August 1, 2010, where he "owned that business outright as well" and made $45,000 in monthly income. FAROLE provided the Farole 0192 Number and the North La Brea Address as his previous employment contact information.

46.  LANG has represented in multiple documents that he worked for Premier Marketing.  For example:

    a.   In a Ford Credit Application Statement dated January 2, 2018, LANG identified "Premier Marketing" as his employer for the past six years [2013 – 2018] and indicated that

he worked in the "Sales."  LANG also identified his work phone number as Lang 9956 Number.

b.   In a Bank of the Ozarks credit application dated April 28, 2018, LANG stated that he had been working at "Premiere Marketing" as a "manager" for six years with a gross monthly salary of $10,000 and provided Lang 9956 Number as his work phone number.

47.   As detailed below, FAROLE was the sole signatory on two bank accounts opened in the name of Premier Marketing: a First Republic Bank ("FRB") account ending in 3897 ("FRB Account 3897") and a US Bank ("USB") account ending in 3147.  FAROLE transferred money from FRB Account 3897 to LANG.

   2.   <u>FAROLE and LANG Work at Paramount Media</u>

48.   Paramount Media, LLC was incorporated in California on March 1, 2018, via LegalZoom.com Inc. as a business for conducting "Marketing Services."  It was given entity number 201807410469.

49.   A Statement of Information filed with the Secretary of State of California on March 21, 2018, identified FAROLE, under the Le Fleur Identity, as the registered manager or member, and the company's registered address as 3940 Laurel Canyon Boulevard, No. 1448, Studio City, California 91604 (the "Laurel Canyon Boulevard Mailbox").

50.   According to a recent search on OpenCorporates.com, Paramount Media was suspended on August 3, 2021.

51.   On August 3, 2022, "Paramount media LLC," with assigned entity number 202251816040, was incorporated via

LegalZoom.com, Inc. using the same company name as before, but using lower cases for "media." According to a Statement of Information filed with the California Secretary of State on September 9, 2022, FAROLE identified himself as Paramount media LLC's manager or member using both the Le Fleur and Dragunov Identities. The address for the manager and member is 15030 Ventura Boulevard, No. 306, Sherman Oaks, California 91403 (the "15030 Ventura Boulevard Mailbox"). Given the similarity in the name and the contact information associated with FAROLE, the remainder of this affidavit assumes that these are the same company.

52. FAROLE has represented in multiple documents that he signed that he runs Paramount Media. For example:

a. In a Keyes European application dated May 3, 2023, that FAROLE filled out under the Dragunov Identity in connection with the purchase of **SUBJECT VEHICLE 2**, FAROLE stated that he was the CEO of Paramount Media, where he had been working for 7 years, 10 months and made $86,000 monthly.

b. In an apartment lease application with 1600 Vine Street dated February 21, 2021, that FAROLE filled out under the Le Fleur Identity, FAROLE stated that he was self-employed as the CEO of Paramount Media, that he "own[ed] the business solely," that he had been employed there since August 1, 2010, and had a monthly income of $65,000. FAROLE provided the Farole 0192 Number and the 15030 Ventura Boulevard Address has his employment contact information.

53.  LANG has represented in multiple documents that he signed that he works for Paramount Media.  For example:

a.  In a Capital One Auto Financing credit application dated November 23, 2018, LANG stated that he had worked full-time at "Paramount Medial[sic]" for eight years and two months as a "sales manager."  LANG provided the Lang 9956 Number as his employer phone number.

b.  In an Action Powersports Inc. purchase contract and credit application dated August 15, 2020, LANG stated that he had been employed by Paramount Media for 18 years in "sales" with a monthly salary of $14,000.  LANG provided the Lang 9956 Number as his work phone number.

c.  In a Ford Credit application dated August 14, 2021, LANG stated that had been working at Paramount Media for 18 years and that he worked in "sales" with a gross monthly income of $12,000.  LANG provided the Lang 4120 Number as his work phone number.

d.  In a Bank of the West credit application dated April 12, 2022, LANG stated that he had been working at Paramount Media for 16 years with a gross income of $22,000 (presumably, monthly) and provided the Lang 9956 Number as his business phone number.

54.  As detailed below, FAROLE was the sole signatory on three bank accounts in the name of Paramount Media, a JPMorgan Chase ("Chase") account ending in 0683 and Bank of America ("BOA") accounts ending in 7022 and 7035.  FAROLE transferred money from the BOA account ending in 7022 to LANG.

3. <u>FAROLE Incorporated Dissonance Entertainment in California</u>

55. On September 23, 2013, FAROLE filed Articles of Incorporation for Dissonance Entertainment with the California Secretary State in which he identified himself as the agent and the North La Brea Address as corporate address.

56. According to the California Secretary of State's website, Dissonance Entertainment was inactive as of September 30, 2015.

57. As detailed below, FAROLE was the sole signatory on a Wells Fargo ("WFB") bank account 9856 in the name of Dissonance Entertainment.

4. <u>LANG Incorporated CML Marketing in Florida</u>

58. CML Marketing Specialists, Inc. was incorporated in Florida on October 21, 2013, according to its Articles of Incorporation. The registered agent and president was LANG, and the company's mailing address was 1134 Chelsea Parc Drive, Minneola, Florida 34715 (the "1134 Chelsea Parc Drive Address"). On March 10, 2023, an online search of the address revealed this is a single-family residence.

59. According to OpenCorporates.com, the company was listed as inactive.

60. As detailed below, LANG was the sole signatory on two bank accounts in the name of CML Marketing: WFB accounts ending in 0565 and 3181.

5.    Th.M. Incorporated Condo Rental Associates Associated in Tennessee

61.   Condo Rental Associates, LLC was incorporated in Tennessee on June 11, 2014, according to its Filing Information with the Division of Business Services Department of State of Tennessee.  The filed document identified Th.M. as the registered agent and the registered address as 5201 Kingston Pike, Ste 6-195, Knoxville, Tennessee (the "Kingston Pike Address").  According to OpenCorporates.com, the company was dissolved on August 6, 2017.

62.   As detailed below, LANG received payments from a Condo Rental Associates BOA account ending in 0203 ("BOA Account 0203"), controlled by Th.M.

63.   Victims described below received fraudulent electronic documents that bore the name of Condo Rental Associates.

6.    K.M. Incorporated Condo Owners Network in Florida in October 2015

64.   Condo Owners Network, LLC was incorporated in Florida on October 30, 2015, according to its Articles of Incorporation. The registered agent was K.M., and the 3936 South Semoran Address as the business mailing address.

65.   According to OpenCorporates.com, the company was listed as inactive.

66.   LANG represented in a Golden Plains Credit Union credit application dated September 16, 2016, he had worked for Condo Owners Network as a manager for three years and three months and that he had worked in that line of work/profession for 16 years.

**E.    The Conspirators Directed Victims to Send Payments to Private Mailboxes Registered to FAROLE**

67.    As explained in further detail below, during phone calls and Skype calls, the Conspirators directed victims to send checks and cash payments to seven different private mailboxes in the Central District of California, all rented out to FAROLE, to include, the Laurel Canyon Boulevard Mailbox; the 15030 Ventura Boulevard Mailbox; 11012 Ventura Boulevard, No. 51, Studio City, CA 91604 (the "11012 Ventura Boulevard Mailbox"); 7162 Beverly Boulevard, No. 321, Los Angeles, CA 90036 (the "Beverly Boulevard Mailbox"); 7336 Santa Monica Boulevard, No. 681, Los Angeles, CA 90046 (the "Santa Monica Boulevard Mailbox"); and 1200 S. Brand Boulevard, No. 810, Glendale, CA 91204 (the "Brand Boulevard Mailbox").

1.    The Laurel Canyon Boulevard Mailbox Received Mail for FAROLE, Paramount Media and Premier Marketing From 2015 to 2018

68.    On March 3, 2020, I went to the address of the Laurel Canyon Boulevard Mailbox in Studio City, CA and found that it was a mailbox rental business called, "24 Hour Private Mailboxes."  Inside the business, I saw mailbox No. 1448 (the "Laurel Canyon Boulevard Mailbox").

69.    On March 4, 2021, the general manager provided records, which showed that T.K. opened the Laurel Canyon Boulevard Mailbox on August 6, 2015, to receive mail for FAROLE, T.K., Paramount Media, and Premier Marketing.  The account was closed on September 1, 2018.

2.   The 11012 Ventura Boulevard Mailbox Received Mail for
     FAROLE from 2014 to 2015

70.   On December 21, 2022, I went to the address of the
11012 Ventura Boulevard Mailbox in Studio City, CA and found a
mailbox rental business sign for "24 Hr. PO Boxes."  The access
door to the mailboxes was locked.  Through the window I observed
rental mailboxes with assigned numbers, but I was unable to
identify mailbox No. 51.

71.   On December 21, 2022, the store manager provided a
copy of a rental application and agreement, which show that on
October 3, 2014, FAROLE rented out mailbox No. 51 (the "11012
Ventura Boulevard Mailbox") to receive mail for Pacific Coast
Advertising.  The Farole 0192 Number was listed in the
application as the contact number.  According to payment log
records, FAROLE made his last rental payment on November 13,
2015.

3.   The 15030 Ventura Boulevard Mailbox Received Mail for
     FAROLE, Premier Marketing, and Paramount Media from
     2018 Through Present

72.   On March 3, 2021, I went to the address of the 15030
Ventura Boulevard Mailbox in Sherman Oaks, CA and found that was
a mailbox rental business called, "The UPS Store."  Inside the
business, I saw mailbox No. 306 (the "15030 Ventura Boulevard
Mailbox").

73.   According to The UPS Store's records, on September 14,
2018, FAROLE, using the LeFleur Identity, signed a mailbox
service agreement and United States Postal Service form 1583 –
"Application for Delivery of Mail Through Agent."  In those

documents, FAROLE indicated that Premier Marketing and Paramount
Media that would be receiving mail at the 15030 Ventura
Boulevard Mailbox.

     4.    <u>The Beverly Boulevard Mailbox was Registered to
Premier Marketing in 2014</u>

    74.  On December 21, 2022, I went to the address of the
Beverly Boulevard Mailbox in Los Angeles, CA and saw that it was
a mailbox rental business called, "Box & Mail."  Inside the
business, I saw mailbox No. 321 (the "Beverly Boulevard
Mailbox").

    75.  According to a single page record provided by the
owner of the business, the Beverly Boulevard Mailbox was rented
out to "Michael," which is FAROLE's first name, Premier
Marketing, and T.T. on July 21, 2014.  The record also
identified the Farole 0192 Number as the contact number.
According to the owner, the record was quite old, and the
mailbox was no longer rented out to the party.

     5.    <u>The Brand Boulevard Mailbox Was Registered to FAROLE
Some Years Ago</u>

    76.  On March 24, 2023, I went to the address of the Brand
Boulevard Mailbox and saw that this was a mailbox rental
business called, "Postal Pack N Ship."  Inside the business, I
saw mailbox No. 810 (the "Brand Boulevard Mailbox").  I inquired
the business owner if he had rented out mailbox No. 810 to
Capital Media, Premier Marketing, or Paramount Media.  The owner
said "Michael FAROLE" had rented the mailbox a long time ago and
described FAROLE as a "sketchy guy and looked unstable."  The
owner also said about FAROLE as, "one day he's this and the next

day, he's that."  After FAROLE's rental agreement period ended, there were several pieces of mail in his mailbox that FAROLE never picked up, so the owner returned them back to the senders. The owner did not remember who the senders were because it happened a long time ago.

**F.    FAROLE, LANG, and the Conspirators Controlled Bank Accounts That Received Fraud Proceeds**

77.  According to bank records, FAROLE was the sole signatory on the following bank accounts:

| Account Opened | Bank | Account Ends In | In the Name Of | Hereinafter |
|---|---|---|---|---|
| 12/7/10 | WFB | 9856 | Dissonance Entertainment | "WFB Account 9856" |
| 9/20/13 | US Bank | 3147 | Premier Marketing | "USB Account 3147" |
| 3/21/17 | FRB | 3897 | Premier Marketing | "FRB Account 3897" |
| 7/2/18 | Chase | 0683 | Paramount Media | "Chase Account 0683" |
| 8/19/22 | BOA | 7022 | Paramount Media | "BOA Account 7022" |
| 8/19/22 | BOA | 7035 | Paramount Media | "BOA Account 7035" |

78.  According to bank records, LANG was the sole signatory on the following bank accounts:

| Account Opened | Bank | Account Ends In | In the Name Of | Hereinafter |
|---|---|---|---|---|
| 6/16/14 | WFB | 0565 | CML Marketing | "WFB Account 0565" |
| 5/25/16 | Chase | 8667 | LANG | "Chase Account 8667" |

79.  More detail about the forensic accounting of these accounts is provided below.

### G. The Conspirators Sent Electronic Documents to Victims in Furtherance of the Conspiracy

80.  Based on my training, experience, and the company's website, DocuSign and Signeasy are electronic signature technology platforms.

1.  <u>DocuSign</u>

81.  According to DocuSign records, a DocuSign account tied to email address custserv@condorentalassociates.com ("CRA DocuSign Account") sent approximately 430 documents for electronic signing between May 2016 and January 2018.

82.  The name of the sender on the documents sent through DocuSign was Ti.M.  According to bank records, BOA Account 0203 made recurring wire payments to Ti.M. totaling $29,594.28 between May 26, 2016, and April 3, 2017.

83.  The DocuSign document names referenced "Travel Wizards Club," "CRA," "Condo Rental Associates," membership agreements, and credit card authorization forms.

84.  Approximately 226 distinct email addresses completed the documents; these included known victims E.P., J.W., M.R., R.T., R.C., C.W., J.H., and J.L.

85.  Victim E.P. provided copies of documents that he signed and received through DocuSign.  For example, on November 15, 2016, E.P. signed a "Condo Rental Associates Membership Agreement."  The document identified "Anthony Parker," an alias of LANG, as the "Rep."  The agreement obligated E.P. to pay a membership fee of $4,800.  In exchange, Condo Rental Associates agreed to place E.P.'s timeshare "into [its] inventory" and

"contact [its] corporate contacts including, but not limited to, event planners, travel agents, vacation clubs, and private individuals." The agreement further stated that "Condo Rental Associates has a 100% guarantee that you will be contacted for a rental/potential rental."

  2.  Signeasy

86. According to records provided by SignEasy in April 2023, a SignEasy account tied to Farole Email 1 was opened in March 2021 that was still active as of April 24, 2023 ("Paramount Media SignEasy Account"). I believe FAROLE operates the account because IP activity logs show that it was accessed from Farole Home IP in August and September 2022, which is associated with **SUBJECT PREMISES 1**, and the payment method for the subscription on the account is a debit card linked to a bank account controlled by FAROLE.

87. Between March 15, 2021, and February 28, 2023, the Paramount Media SignEasy Account sent approximately 648 documents for electronic signing to victims. From the recipients' email addresses provided, I recognized several that belonged to known victims, including S.T., L.W., and R.S.

88. According to records provided by Signeasy on June 16, 2023,[7] the documents that the Paramount Media Signeasy Account sent to victims were primarily boilerplate agreements and forms. For example, on September 29, 2022, victim R.S. signed a

---

[7] On June 5, 2023, the Honorable Rozella A. Oliver, United States Magistrate Judge, signed a warrant pursuant to 18 U.S.C. § 2703 requiring Signeasy to disclose certain records associated with the Paramount Media Signeasy Account.

"Paramount Media Non-Dispute Form."  The form required R.S. to agree that "My Rep DID NOT indicate, Promise, Guarantee, or Directly state a quick turnaround or Date of receiving a check," to "reach out to victor Directly regarding updates on the transaction," and that "this fee is to Paramount Media, not to the Rep."  The form provided the Farole 7316 Number as the phone number for "Victor."  Many other victims were required to sign the same or similar form.

### H.    Through Telemarketing Calls, FAROLE and LANG Defrauded Elderly Victims into Making Bogus Advance Payments

89.    Based on victim interviews that I or other law enforcement agents have conducted, emails, invoices, and other documents provided by victims, victims' handwritten notes, my review of call recordings, DocuSign records, Signeasy records, Microsoft records, bank records, Stripe records, and my conversations with other law enforcement agents, FAROLE and LANG have defrauded over 370 victims into paying over millions of their savings to the Telemarketing Companies.  The information obtained thus far suggests that the vast majority, if not all, of victims are over the age of 55.

90.    According to Microsoft records obtained thus far, in just one year (June 25, 2020, to June 25, 2021)[8]:

a.    FAROLE made 2,163 calls to 114 unique phone numbers, including those belonging to known victims B.C., D.A., J.B., M.F.T., R.S., R.C., S.K., and S.T.  Of the total calls,

---

[8] Microsoft records obtained thus far do not cover the entire timespan of the conspiracy; additional information is pending.

hundreds were from IP addresses associated with FAROLE's former residences, including Farole Vantage IP and Farole Vine IP.

b.    In the same year, LANG made 2,317 calls to 376 unique phone numbers, including those belonging to known victims B.C., C.W., D.A., J.W., J.B., J.H., R.S., R.C., S.K., and S.T. Of the total calls, at least 179 were made from Lang Home IP.

c.    There were hundreds of instances in which FAROLE and LANG called the same victim phone number, often on the same day or within a few days of each other.  As detailed below, it appears that FAROLE and LANG would make up reasons for putting a victim in contact with the other, such as that the other had found a buyer or renter for the victim's timeshare.

1.    <u>Victim J.N.</u>

91.    Based on law enforcement reports, FBI interviews with J.N., J.N.'s detailed handwritten journal of her telephone communications with the Conspirators, and copies of proof of mailing provided by J.N., I know the following.

92.    On May 9, 2019, the FBI interviewed J.N., an 86-year-old female, a resident of Napoleon, Ohio.  J.N. explained that in 2012, she sold her timeshare to a Florida-based company called Z Land Trust, LLC.  In 2014, J.N. began receiving unsolicited phone calls from the Conspirators.  She first received a call from a man who claimed that J.N. still owned her timeshare that she sold in 2012.  The caller claimed that sale did not close because there was a problem with the deed and documents related to the sale of her timeshare.

93.  From February 2014 to May 2019, J.N. kept a detailed journal of her telephone communications with the Conspirators, who called J.N. purporting to represent, among other companies, Premier Marketing and Paramount Media.

94.  The Conspirators who called J.N. identified themselves as James Harper, Christopher Stevens, Anthony Parker, Jonathan Williams, and Jonathan Martin.  J.N. recognized some of the voices were similar in sounding and believed they were repeat callers using different aliases.  For example, J.N. wrote in her journal that the callers who identified themselves as Jonathan Williams and Jonathan Martin sounded the same and both called from the Farole 2199 Number, which is tied to FAROLE as previously discussed.  As discussed, "Anthony Parker" is LANG.

95.  The Conspirators directed J.N. to pay thousands of dollars each time for various bogus service fees promising to provide services related to her timeshare, but nothing ever came to fruition and her money was not returned to her.

96.  The Conspirators promised to use J.N.'s money to help resolve her timeshare deed issues, help sell her timeshare, help purchase more timeshares, help get her money back from previous payments of fees that she made, and other false promises, none of which ever came to fruition.  For example:

a.  In February 2014, "James Harper" ("Harper") from Los Angeles, California told J.N. that she still owned her timeshare because the transfer of her timeshare to Z Land Trust was not legally executed.  "Harper" claimed he could help J.N. reverse the deed if J.N. paid a service fee of $3,050.  J.N.

31

sent a check in the mail, but she never received any confirmation from the Conspirators that the deed was in fact reversed.

b.   In March 2015, "Christopher Stevens" ("Stevens") told J.N. that he would help sell her timeshare.  He convinced J.N. to send checks for "tax papers" and additional fees.

c.   In December 2015, "Anthony Parker" ("Parker") called J.N. from Premier Marketing and promised J.N. that he would help her recover money from the sale of her timeshare and other fees she had paid and help her purchase more timeshares in exchange for service fees.  In April 2016, Parker told J.N. that he would be sending her "$165,000 for 2 units plus other recovered payments of $47,468 by certified check," which she never received.

d.   In August and September 2016, "Steven Jackson" pretended to be calling from the Colorado Attorney General's Office and threatened J.N. with a legal action if she did not speak to Premier Marketing and Anthony Parker.

e.   In June 2017, "Jonathan Williams," calling from the Farole 2199 Number, told J.N. that he would help J.N. get a large recovery from Fraud Solutions from being scammed, but first J.N. had to pay a "retainer fee," and then later, a "holding fee" before received the proceeds.

f.   In August and September 2017, "Williams" convinced J.N. that the IRS was going to audit her and to send additional payments for "back taxes" and "holding fees" on her timeshare.

g.    In September 2017, "Williams" told J.N. that they had a buyer who wanted to rent three units of her timeshare, but J.N. first had to send additional fees before receiving the proceeds from the rental, which she never did.

h.    From March 2018 to February 2019, "Jonathan Martin" ("Martin") called J.N. from the Farole 2199 Number from Premier Marketing and convinced her to send "closing and recording fees" and to do so in cash to avoid alerting the bank. In multiple instances, "Martin" told J.N. that the envelopes she had mailed had arrived empty and convinced her to send more cash payments.

97.    From 2014 to 2019, J.N. said she paid the Telemarketing Companies a total of at least $320,000, which came from her savings and investment accounts and social security income.  The Conspirators also directed J.N. to pull more funds out of her investment account to supplement her payments for bogus service fees.  The Conspirators directed J.N. to withdraw cash from her bank to purchase cashier's checks at a different bank and mail cash directly to avoid causing her bank to trace the money back to the Conspirators.

98.    According to bank records, checks from J.N. totaling approximately $167,000 were cashed or deposited between January 2015 and July 2019 into various Telemarketing Companies' accounts, including:

a.    FAROLE deposited approximately $77,163 into FRB Account 3897.

b.    FAROLE deposited approximately $31,750 in checks into USB Account 3147.

c.    FAROLE cashed checks totaling approximately $58,100 at the Sherman Oaks Check Cashing Business.

2.  Victim E.P.

99.  Based on FBI interviews with E.P., law enforcement reports, E.P.'s journal of his telephone communications with the Conspirators, documents provided by E.P., a recorded telephone call between E.P. and FAROLE, Microsoft records, and bank records, I know the following.

100. On January 9, 2023, during my phone interview of E.P. from Gladstone, Illinois, he stated to me that in 1989, he bought a two-bedroom timeshare in Westgate resort in Florida. In November 2010, E.P. exchanged his timeshare with a company called, "Anytime Vacations" with their unlimited vacation membership. According to a copy of "Anytime Vacations Sales Agreement Worksheet," dated November 20, 2010, which I reviewed, E.P. paid $5,495 in a trade-in deal to sell his timeshare valued at $5,500 in exchange for the vacation membership priced at $10,995.

101. According to an FBI interview of E.P. conducted on September 26, 2019, E.P. stated to the interviewing agent that in June 2014, E.P. began receiving telephone calls from a man who identified himself as James Logan ("Logan") from the Farole 2199 Number. Based on my knowledge of the investigation, "Logan" is believed to be FAROLE. "Logan" said that he represented, among other companies, Premier Marketing, Paramount

Media, Condo Owners Network, Condo Rental Associates, and CML Marketing Specialists.

102. "Logan" convinced E.P. that he still owned his timeshare in Westgate resort in Florida that E.P. had traded in for vacation membership in 2010. "Logan" induced E.P. to send advertising fees and other bogus fees that "Logan" promised to use to help E.P. sell his timeshare and even obtain more timeshares. Over and over again, "Logan" would convince E.P. that they had a buyer lined up and would make up a reason for why the deal fell through, each time securing additional fee payments from E.P. For example:

a. In April 2015, "Logan" told E.P. that the company had a buyer for E.P.'s timeshare but there was a problem with the taxes on the timeshare.

b. In August 2015, "Logan" told E.P. that he would return $20,000 within ten days to E.P. for the money that he paid to other companies that did not sell E.P.'s timeshare, but E.P. first needed to pay an additional $4,500 related to "Logan's" efforts.

c. From December 2015 to January 2017, at "Logan's" direction, E.P. sent more checks totaling $29,484 payable to Premier Marketing and CML Marketing Specialists to the Laurel Canyon Boulevard Mailbox for taxes and maintenance fees, title transfer fees, and pay off.

d. From April 2016 to January 2017, at "Logan's" direction, E.P. made payments to Condo Owners Network using

checks and credit cards for a total of $35,865 for purported title transfer fees.

  e.  In February 2018, "Logan" told E.P. that he would help E.P. get $180,000 in refunds, but E.P. had to first send $5,100 as a fee payment to run the sale of his timeshare through another company that "Logan" was affiliated with.

103. From 2014 to 2019, in total, E.P. paid over $140,000 in cash, checks, and payments by credit cards to the Telemarketing Companies believing that "Logan" was going to fulfill the promises he made to E.P.  None of the promises ever came to fruition, and E.P. never received any of his money back from "Logan."

104. As part of the scheme, "Logan" had E.P. sign multiple written agreements which claimed that the Telemarketing Companies would help sell E.P.'s timeshare in exchange for advertising fees.  For example:

  a.  On April 24, 2015, E.P. signed a "Premier Marketing Advertising Disclosure Document" agreeing to have Premier Marketing advertise his timeshare to qualified buyers, renters, and licensed real estate brokers for a $3,850 fee which was a one-time, non-refundable fee.

105. As described above, E.P. signed a "Condo Rental Associates Membership Agreement" on November 15, 2016, by which E.P.'s membership fee of $4,800 was supposed to facilitate advertising by Condo Rental Associates to secure a "100% guarantee" that E.P. would be "contacted for a rental/potential rental."

106. On October 4, 2019, E.P. placed a recorded call to the Farole 0192 Number from E.P.'s cell phone.[9]  This call lasted 37 minutes.  The following is a summary of the recorded call:

a.    A man answered the call from E.P. claiming to be "Jason Ramone" who had taken over for "Logan."

b.    The man told E.P. that Farole 0192 Number was not his correct number because it forwarded calls to his office. The man told E.P. to instead call his direct line, the Farole 7316 Number.

c.    The man told E.P. that he was going to help him get his refund back at no costs, and whatever "Logan" had told him in the past was not going to happen again.  The man promised E.P. that he would stay in constant contact with E.P. to help get his money back.

d.    E.P. asked how exactly he was supposed to get his refund back.  The man never explained how exactly that was going to happen but repeated the same thing.  E.P. asked, "So how am I going to get all my refunds?  I got two timeshares that you're selling for me and after they are sold you said you were going to get all my refund back.  This is what James told me in the last five years."  The man said, "Hold on!  I'm not James, so you need to know that.  I'm new to this, so I will work with you on this."

e.    The man asked E.P. if he had filed any complaints against Paramount Media.  E.P. said he hired a private

---

[9] According to Verizon records, on October 4, 2019, the Farole 0192 Number did receive an incoming call from Cleveland, Ohio from E.P.'s cell number.

investigator and would contact the FBI if he didn't get his money back.  E.P. told the man, "I actually found out that you are Michael Anthony Farole and you got your name changed to Michael LeFleur."  The man told E.P. to cancel all complaints and stop the "nonsense" with going to the private investigator and the FBI, so he could help E.P. get his refund.  He told E.P. to stop threatening him about going to the FBI.

> f.    The man told E.P. that on Monday, he would fax a document to E.P. stating in writing that he would continue to work with them to get the refund at "zero costs."  However, the man also told E.P. that the faxed document will include a provision that E.P. promise to drop all complaints and only work with him.  The man wanted E.P. to sign the faxed document when he received it on Monday and fax it back to him.

107. On December 12, 2022, E.P. advised me during a phone call interview that he did not recall ever getting the faxed document.

108. According to DocuSign records, E.P. signed seven documents sent by the CRA DocuSign Account between September 2016 and March 2017.  One of these was the November 15, 2016, membership agreement described above.

109. According to Microsoft records, FAROLE made 42 calls and sent two text messages to E.P. in October and November 2019.

110. According to bank records, checks from E.P. totaling approximately $98,022 were cashed or deposited between April 2015 and March 2019 into the Telemarketing Companies' accounts, including:

      a.   FAROLE deposited approximately $37,788 into FRB Account 3897 between April and November 2017.

      b.   FAROLE deposited approximately $19,034 into USB Account 3147 between April 2015 and February 2017.

      c.   FAROLE cashed checks totaling approximately $17,000 at the Sherman Oaks Check Cashing Business between December 2018 and March 2019.

      d.   LANG deposited $14,300 in WFB Account 0565 between January and April 2016.

   3.  <u>Victim D.A.</u>

111. According to a copy of the IRS-CI Memorandum of Interview for a May 7, 2021, interview of victim D.A., D.A. was interviewed by IRS-CI Agents.  D.A. told agents the following:

      a.   D.A., a resident of Sikeston, Missouri, said she and her husband in 2014 purchased a timeshare condo at Vacation Village in Weston, Florida.  After her husband passed away, D.A. decided to sell her timeshare in 2020 to pay IRS taxes that her husband had owed.

      b.   A man who identified himself as "Scott" called D.A. from the Lang 4117 Number.  "Scott" claimed he would help D.A. sell her timeshare.  D.A. could not remember the dates and exact amounts of payments she made to "Scott" to start the process of selling her timeshare, but she said the payments were each $2,000 or $3,000.  "Scott" wanted D.A. to send cash payments through the U.S. Postal Service ("USPS"), but D.A. did not send cash because she was uncertain that the USPS shipped cash.

c.   D.A. said she was later received a call from Farole 7316 Number from a man who identified himself as "Victor." "Victor" told D.A. that "Scott" was defrauding her, so "Scott" had been let go from the company.

d.   D.A. said she then began dealing with "Victor" to sell her timeshare. "Victor" directed D.A. to make three payments to Paramount Media using cashier's checks, which she mailed to an address in Sherman Oaks, California with zip code 91403. D.A. made her first payment to Victor using cashier's check #8299514559, for $6,800, dated December 31, 2020, payable to Paramount Media.

e.   According to a copy of this check that an IRS-CI Agent obtained from Sherman Oak's Check Cashing business in Los Angeles, California, on January 12, 2021, FAROLE cashed the check for a fee of $273.00. The front of the check showed D.A.'s name in the memo as the remitter, and the reverse side of the check showed that it was endorsed by a Paramount Media officer.

f.   D.A. said her subsequent cashier's check payments to Paramount Media ranged from $6,850 to $6,950 each. Her most recent cashier's check was sent to "Victor" on April 27, 2021. "Victor" kept pestering D.A. about where the payments were until he received them. D.A. texted the shipping tracking number to "Victor." "Victor" told D.A. very recently that the process of her timeshare sale "was on its last leg" and was almost done. D.A. said she sent more money to "Victor" to speed up the process, but nothing ever came to fruition.

g.    In 2020, D.A. withdrew funds from her retirement account at the Modern Woodmen of America to send payments to "Scott" and "Victor."  As a result, D.A. received mail from the IRS that she owed taxes on the withdrawals she made.

h.    D.A. said that she had phone calls and text messages with Victor via Farole 7316 Number and telephone number 347-809-3306.

112. According to Microsoft records, from July 2020 through June 2021, Lang 4117 Number and Farole 7316 Number placed over 130 calls to D.A.  In addition, Farole 7316 Number also exchanged over 300 text messages with D.A. during that same time.

4.    Victim B.C.

113. I know the following based on my review of a complaint filed with the Federal Trade Commission ("FTC") on September 8, 2021, by victim B.C., an IRS-CI Memorandum of Interview of June 8, 2022, interview of B.C., Microsoft records, Chase records, and Stripe records.

114. According to B.C.'s initial complaint filed with FTC:

a.    B.C., a resident of Wixom, Michigan, had purchased a membership in "Lifestyle Vacation Club."

b.    In February 2019, B.C. received a cold call from someone in connection with "Paramount Media."  B.C. spoke with "Don Lewis" ("Lewis"), who called from Lang 4117 Number, and "Victor," who called from Farole 7316 Number.

c.    "Lewis" and "Victor" called B.C. for over a year and half and convinced her to pay a total of over $28,000 to

Paramount Media for various fees, such as assessment fees and taxes that were purportedly necessary to close the deal on renting out weeks of B.C.'s vacation club membership.  They also promised B.C. that they would help sell her membership.

       d.    Despite the payments that B.C. made to Paramount Media with her credit card, none of the promises made by "Lewis" and "Victor" ever came to fruition.

115. On June 8, 2022, B.C. was interviewed by IRS-CI Agents.  According to a copy of IRS-CI Memorandum of Interview for June 8, 2022, interview of B.C.:

       a.    B.C. stated that she owned two timeshares.  One of the timeshares was in Puerto Plata, Dominican Republic, which was purchased through a company called, "Lifestyles Vacation Club."  During the COVID-19 pandemic, B.C. wanted to sell her timeshare in the Dominican Republic.  B.C. received a cold call from someone from Paramount Media who offered to sell B.C.'s timeshare for $48,600.  B.C. spoke with the marketer, "Don Lewis" on Lang 4117 Number and owner, "Victor."

       b.    B.C. received invoices via email from "Lewis" and "Victor," and paid over $20,000 to Paramount Media for various fees, such as purported quit claim deed fees related to selling her timeshare.  B.C. made these payments by wire and debit card with funds from her Wells Fargo bank account.  However, "Lewis" and "Victor" never sold B.C.'s timeshare as promised.

116. A review of supporting documents provided by B.C. included copies of Paramount Media invoice receipts, which

identified Farole Email 1 as the contact email address for the company and Farole 7316 Number as the contact phone number.

117. The invoices, dated from August 2020 to July 2021, documented payments made by B.C. to Paramount Media in the amounts of $4,150, $4,550, $3,575, $4,175, $4,050, and $3,150. All the payments were for "non-refundable, non-disputable fee[s]." Some of the invoices had wire payment instructions to send the payment to a Wells Fargo bank account number ending in 1714 ("Wells Fargo Account No. 1714").

118. According to Microsoft records, between February 2020 and June 9, 2022, Farole 7316 Number exchanged a total of 188 calls with B.C.

119. Microsoft records show that from July 6, 2020, to June 24, 2021, Lang 4117 Number exchanged 37 calls with B.C. On June 24, 2021, Lang 4117 Number placed a call to B.C.'s cell phone number using Lang Home IP.

120. According to records provided by SignEasy, Farole Email 1 sent approximately seven documents to S.T.'s email address via Signeasy between April 5, 2021, and July 15, 2021. Five of these documents appear to have been electronically signed by B.C. and returned to Farole Email 1.

121. According to Stripe records detailed below, from August 2020 through July 2021, B.C. paid approximately $23,650 to Paramount Media, which went to Chase Account 0683.

   5.   <u>Victim L.W.</u>

122. I know the following based on my review of FBI reports prepared summarizing interviews with victim L.W., emails

provided by L.W., audio recordings, bank records, Signeasy records, and my conversations with other law enforcement agents.

123. On May 9, 2023, FBI Special Agents interviewed victim L.W. at her home in Louisville, KY.  According to L.W.:

124. In 2016, L.W. bought a timeshare with the Holiday Inn Vacation Club, and in 2018, bought a second timeshare in Florida.

125. In approximately 2018, L.W. first received a call from Lang 4117 Number.  The caller, "Scott Graham" ("Graham"), claimed to work for "All Destinations Rental" in the Orlando, FL area and offered to help L.W. sell or rent her timeshares.

126. In November 2021, "Graham" again contacted L.W. from Lang 4117 Number and claimed to have a potential renter for L.W.'s timeshare.  The potential renter was "Victor," from Paramount Media, who contacted L.W. separately from Farole 7316 Number.

127. According to Microsoft records, the Farole 7316 Number exchanged approximately 67 calls with L.W. between November 10, 2021, and September 9, 2022.

128. According to L.W., between November 2021 and present, L.W. paid Paramount Media for various purported services, which included taxes and fees for renting L.W.'s timeshare.  L.W. never received any of the services that she was promised.

129. According to L.W., the payments that L.W. made to Paramount Media were documented in invoices that were accompanied by electronic documents that L.W. signed via Signeasy.

130. Records provided by Signeasy confirm that the Paramount Media Signeasy account sent L.W. approximately 21 documents for electronic signing via Signeasy between November 10, 2021, and January 31, 2023. It appears that L.W. signed all 21 documents and returned them to Farole Email 1.

131. L.W. provided copies of invoices and receipts from Paramount Media documenting the electronic payments that she made. For example:

     a. A Paramount Media receipt dated November 11, 2022, documented a payment of $4,550 from L.W.'s Mastercard ending in 4264 to Paramount Media that was processed via GETTRX, an electronic payment processer.

     b. A Stripe payment invoice dated May 3, 2023, addressed to L.W. from Paramount Media documented a fee of $3,410 due by June 2, 2023. The invoice directed questions to be sent to Farole Email 1 or the Farole 7316 Number.

132. According to Chase records, FAROLE deposited two checks from L.W. into Chase Account 0683:

     a. On July 13, 2022, FAROLE remotely deposited a check from L.W. in the amount of $3,100.00.

     b. On August 18, 2022, FAROLE remotely deposited a check from L.W. in the amount of $4,715.00.

133. According to Stripe records detailed below, L.W. made a total of approximately $62,945 in payments to Paramount Media, which went to Chase Account 0683.

134. During an interview on May 10, 2023, victim L.W. told FBI Agents that "Victor" had called her earlier on the same day. L.W. said the following transpired during the call:

    a.   "Victor" told L.W. to pay $6,500 to expedite her cashier's check.  This was referring to a $145,000 cashier's check that "Graham" had told L.W. on May 10, 2023, that she would be receiving through overnight mail.

    b.   The $145,000 check was supposed to be proceeds from the purported sale of her timeshare and back-pay for the funds that she had paid Paramount Media.  "Victor" told L.W. that the courts had held up her payment and the COVID-19 pandemic also played a factor in the delay.

    c.   L.W. told "Victor" that she wasn't going to pay the additional funds.  "Victor" then told L.W. that she would be reimbursed for the $6,500 payment.

135. During a recorded call on May 10, 2023, L.W. again spoke to "Victor" about the $6,500 payment.  L.W. asked "Victor" to pay the $6,500 for her because she had already paid $70,000. Victor told L.W. that he could not make the payment for her since "all the payments are for exactly what they are." "Victor" told L.W. that he could not legally take one of her prior payments and apply it somewhere else.  L.W. did not agree to send the $6,500.

136. During the phone calls on May 10, 2023, between L.W. and "Victor," the Farole 0192 Number was located near **SUBJECT PREMISES 1**, according to Verizon records.

137. On May 22, 2023, L.W. received an email from Farole Email 1 with display name "Victor Romano."  The email subject line showed: L.W. "this is victor."  The email message from Victor was as follows:

> [L.W.], I need you to call me asap.  This is regarding the dispute.  I need to speak to you regarding this immediately, you must call and cancel them today in order for us to finish your service, you have time to do that at the moment, but once it comes through to the office then it is too late.  Our legal team would then have to respond and provide all the documentation that you signed verifying that you knew it was non disputable … instead of losing the transaction and the funds, have this fixed before its too late and I can guarantee completion … EVERY single time this has happened with a client we have won that disputes,,,every single time … trust me … I promise you [L.W.], I will not be dishonest … please call me asap so we can discuss."

138. On May 22, 2023, at 4:27 PM, when Farole Email 1 sent the above to L.W., the Farole 0192 Number was located near **SUBJECT PREMISES 1**, according to Verizon records.

6.  <u>Victim R.S.</u>

139. I know the following based on my review of FBI reports prepared summarizing interviews with victim R.S., emails provided by R.S., audio recordings, bank records, Signeasy records, and my conversations with R.S. and other law enforcement agents.

140. On May 16, 2023, FBI Special Agents interviewed victim R.S., an 81-year-old retired federal worker, at his home in Reston, Virginia.  According to R.S.:

141. R.S. purchased a timeshare in The Colonies at Williamsburg Resort about 15 to 20 years ago.  R.S. later traded in this timeshare for a second timeshare.

142. In September 2019, R.S. received a phone call from "Don Lewis" ("Lewis"). Based on my knowledge of this investigation, I know that "Lewis" is an alias of LANG's. R.S. showed agents the telephone numbers associated with "Lewis" on his phone, which included the Lang 4117 Number, the Lang 9956 Number, and the Lang 7306 Number.

143. R.S. also received phone calls from "Victor Romano," who said he worked for Paramount Media. R.S. showed agents the telephone numbers associated with "Romano" on his phone, which included the Farole 7316 Number and phone number 618-679-4451.

144. According to Microsoft records, the Farole 7316 Number exchanged approximately 419 calls with R.S. between February 27, 2020, and September 8, 2022, and the Skype numbers associated with LANG exchanged approximately 62 calls with R.S. between July 6, 2020, and June 6, 2021.

a. Farole Vine IP was captured on at least eight calls from the Farole 7316 Number to victim R.S. -- on April 26, 2021 twice, on May 5, 2021 three times, on May 19, 2021, June 9, 2021, and June 23, 2021.

b. Lang Home IP was captured on at least six calls from LANG -- on May 19, 2021 twice, on May 31, 2021, on June 4, 2021 twice, and on June 9, 2021.

145. The Conspirators told R.S. that he could rent out or sell "getaway" weeks associated with his Williamsburg timeshare to big companies who would have conferences at his property. The Conspirators told R.S. that he had to agree to advertise his timeshare for one year or five years.

146. R.S. ultimately signed up to a five-year advertising agreement, which he formalized through a written agreement that he signed electronically through DocuSign.

    a.  R.S. provided a copy of the initial agreement that he signed via DocuSign.  The agreement was dated September 13, 2019, between "Gorgeous Rental Club" and R.S.  In the document, R.S. agreed to pay a one-time "advertising fee" of $2,394.00 in exchange for advertising of R.S.'s timeshare on the company's website, paid search engine ads, and social media.

147. R.S. said that he also signed some documents electronically through Signeasy.

    a.  Records provided by Signeasy confirm that Farole Email 1 sent R.S. approximately 28 documents for electronic signing via Signeasy between March 23, 2021, and February 1, 2023.  It appears that R.S. signed 27 documents and returned them to Farole Email 1.  These included the September 29, 2022 "Paramount Media Non-Dispute Form" described above.

148. Over the next few years, the Conspirators told R.S. that he needed to pay more fees, including fees associated with "rental agreements."  The amount of the fees requested changed over time.  R.S. estimated that in total he had paid over $200,000.  The sale of the timeshare weeks with which these fees were associated never materialized.

149. R.S. received payment requests via email invoices.  R.S. made payments electronically to Paramount Media with credit cards.  R.S.'s last payment was for $15,000 on April 28, 2023.

150. R.S. provided copies of email invoices and receipts that he received from Paramount Media.  For example:

a.   A Stripe payment invoice dated April 27, 2023, addressed to R.S. from Paramount Media documented a fee of $15,000 due by June 2, 2023.  The invoice directed questions to be sent to Farole Email 1 or the Farole 7316 Number.

b.   A Stripe payment receipt dated February 21, 2020, documented a payment of $3,145.00 from R.S. to Paramount Media.

151. According to Stripe records detailed below, R.S. made approximately $164,833 in payments between November 18, 2022, to January 19, 2023, to Paramount Media, which went to Chase Account 0683 and BOA Account 7022, which as described above were controlled by FAROLE.

152. R.S. provided voicemails that he received, which appeared to be from LANG based on the phone numbers called from and aliases used.

a.   In one voicemail, LANG, using the "Lewis" identity, said he had "good news" about the "rental leases you contracted us to rent for you" and asked R.S. to call him back at Lang 9956 Number.

b.   In another voicemail, LANG, using the "Lewis" identity, said that he had an "update" on "Lifestyle," likely referring to "Lifestyle Vacation Club," and directed R.S. to call either him or "Victor," referring to FAROLE.

c.   FAROLE, using the "Victor" identity, left a voicemail for R.S., saying that he had spoken with "Scott," referring to LANG, and wanted to "go over a couple things" with

R.S. so they could "get everything done."  FAROLE said he was calling from Paramount Media "customer service" and to call him back at the Farole 7316 Number.

      d.   FAROLE, using the "Victor" identity, left a voicemail for R.S. saying that "everything was going really good" and he should "have an answer right after the 1st of the year" and that "everything should be hopefully wrapped up by then."

153. According to FBI Special Agents in Kansas, FAROLE has been calling R.S. as recently as June 20, 2023.

### I.   The Telemarketing Companies' Accounts Were Funded by Fraud Proceeds from Victims

154. Based on my review of bank records, Stripe records, Signeasy records, Microsoft records, and victim interviews and documents, I believe that the finances of the conspiracy operated roughly as follows.

155. For incoming proceeds from victims:

      a.   From 2013 to 2018, FAROLE and LANG deposited checks and cash payments mailed by victims directly into the Telemarketing Companies' bank accounts, including WFB Account 0565 (controlled by LANG), WFB Account 9856, USB Account 3147, and FRB Account 3897 (all three controlled by FAROLE). Eventually, the banks closed some of these accounts for fraud.

      b.   From 2018 to 2019, FAROLE cashed checks mailed by victims at a check cashing business located in Sherman Oaks, California.

c.   From 2019 to 2023, FAROLE and LANG directed victims to send payments electronically through Stripe, an online payment platform.  The Stripe accounts transmitted victim funds to Chase Account 0683 and BOA Account 7022.

156. How victim proceeds were spent:

a.   FAROLE controlled the majority of the Telemarketing Companies' bank accounts and paid himself from the Telemarketing Companies' accounts through checks addressed to himself and cash withdrawals.

b.   FAROLE also made personal purchases directly from the Telemarketing Companies' accounts, including luxury goods, rent on his personal residences, luxury car leases, personal travel, electronics, and furniture.

c.   FAROLE would send proceeds from the Telemarketing Companies' accounts to LANG's personal bank accounts, primarily Chase Account 8667, at first through cashiers' checks and money orders, and later through Zelle electronic transfers.  LANG spent the fraud proceeds on personal expenses, including mortgage payments on his house, cars, trucks, RVs, ATVs, guns, and a boat.

1.   <u>From 2013 to 2018, FAROLE and LANG Deposited Victims' Payments into Accounts Controlled by Them and Spent the Proceeds on Personal Expenses</u>

*a.   USB Account 3147*

157. According to records from US Bank, FAROLE opened USB Account 3147 on September 20, 2013, in the name of Premier Marketing, as the sole signatory.  The Beverly Boulevard Mailbox was the listed address for Premier Marketing.  On the same day,

FAROLE electronically signed a US Bank document certifying that he was "the fully elected, qualified and acting Secretary, Manager of Authorized Member of Premier Marketing."

158. According to bank statements, on January 2, 2015, USB Account 3147 had a beginning balance of $3,549.19.  Most, if not all, deposits thereafter came from victims of the scheme.

159. Based on my review of US Bank's electronic copies of deposit slips and images of checks payable to Premier Marketing, from January 2015 to February 2017, the account was funded with deposits of checks written by individual victims, which totaled $604,873.  The checks were payable to Premier Marketing, remitted by 46 individuals from 20 states.  The deposits included $14,234 in checks from victims E.P. and $27,556 in checks from victims J.N. described above.

160. According to bank records, FAROLE withdrew a total of $605,907 from USB Account 3147 between January 2015 and February 2017.  FAROLE's pattern was to quickly withdraw cash from the account after he deposited the victims' checks, mostly on the same day or several days afterwards.

161. FAROLE used cash that he withdrew from USB Account 3147 to purchase Wells Fargo Bank cashier's checks payable to LANG for his profit split in the timeshare scheme.  From June 2016 to October 2016, FAROLE purchased a total of $24,102 in Wells Fargo Bank cashier's checks payable to LANG.  I was able to match memos on LANG's checks to specific victims whose checks were deposited into USB Account 3147.  For example:

a.    On August 4, 2016, a check in the amount of
$3,500 from victim R.F. in Illinois was deposited in USB Account
3147.  On August 5, 2016, FAROLE withdrew $3,500 in cash from
USB Account 3147.  That same day, FAROLE purchased a cashier's
check for $2,443 payable to LANG and referenced, "R.F. Payout"
in the check memo.  LANG subsequently deposited this check in
Chase Account 8667.

b.    On August 5, 2016, two checks totaling $6,200
from victim W.C. were deposited in USB Account 3147.  On August
8, 2016, FAROLE withdrew $6,200 in cash from that account.
Shortly thereafter, from a Wells Fargo Bank branch office in
Studio City, California, FAROLE purchased a cashier's check for
$2,473 payable to LANG.  FAROLE referenced "W.C. Payout" in the
check memo.  LANG subsequently deposited this check in Chase
Account 8667.

162. FAROLE also used $58,676 of the proceeds in USB Bank
3147 to pay his rent at the Laurelwood Drive Address.

163. On February 15, 2017, US Bank closed Account 3147, due
to an investigation finding that the account involved activities
related to elder financial exploitation.  US Bank determined the
account was primarily funded by checks from individuals ages 75
to 90, conducted suspicious cash withdrawals with no definitive
business purpose related to "Marketing Consulting Services," and
involved transactions primarily from US Bank Branch Office No.
5285 in Sherman Oaks, California.

*b.    FRB Account 3897*

164. According to FRB records, FAROLE opened FRB Account 3897 in the name of Premier Marketing on March 21, 2017, shortly after USB closed USB Account 3147.  On the signature card, FAROLE was the sole signatory and "owner" of Premier Marketing and provided Farole 0192 Number and Farole Email 2 as his contact information.

165. FRB Account 3897 became the new repository for victim funds; FAROLE deposited checks, which totaled approximately $557,459, remitted by the 30 individuals from across the nation, from March 2017 to March 2018.  Of the 96 check deposits, 72 checks appeared to have come from individuals over the age of 65.  This included victim E.P. described above.  Based on my review of FRB bank records, victim checks appeared to be the only source of funds for FRB Account 3897.

166. FAROLE funneled the proceeds from FRB Account 3897 to himself, LANG, and Universal Marketing Bureau as follows:

a.    FAROLE paid himself by writing 22 checks payable to "Michael Le Fleur," which totaled $135,700.

b.    FAROLE wrote checks totaling $134,963 payable to LANG.  Several of the check memos referenced known victim names, including victims J.H. and W.C.  LANG endorsed and deposited these checks in Chase Account 8667.

c.    FAROLE wrote ten checks payable to "Universal Marketing Bureau" totaling $36,327.  These checks were deposited into WFB Account 2945.

167. FAROLE also spent directly from FRB through a debit card ending in 1726. FAROLE bought approximately $195,837 worth of personal goods and services, including luxury goods like Cartier jewelry, Amazon products, recurring car payments to Mercedes-Benz, and luxury travel and restaurants.

168. FAROLE also paid approximately $36,420 in rent on the Laurelwood Drive Residence from April 2017 to February 2018. In June 2017, he purchased a cashiers' check for $8,000 that went to a plastic surgeon in Los Angeles.

169. Following a fraud investigation, FRB closed FRB Account 3897 on March 7, 2018. FRB concluded that the account was fraudulent due to the large number of check deposits from elderly individuals, self-endorsed checks to FAROLE followed by rapid withdrawals, debit and point-of-sale transactions that had no apparent business purpose, and checks to LANG and Universal Marketing Bureau, which had been the subject of consumer complaints.

c.   *WFB Account 0565*

170. According to WFB records, LANG opened WFB Account 0565 on June 16, 2014, in the name of CML Marketing. LANG was the sole signatory and provided Lang 4120 Number as his phone number and 1720 Goose Cross CT, Port Orange, FL 32128 (the "Goose Cross Address") as the address. LANG deposited $69,600 to open the balance.

171. The total amount deposited in WFB Account 0565 was $606,690 from June 2014 to June 2016, which came from the following sources:

      a.   Between January 2016 and April 2016, LANG deposited a total of approximately $78,985 in checks from 16 victims, whose addresses spanned 13 states.  Seven of these victims also wrote checks to Premier Marketing that were deposited in USB Account 3147, suggesting that FAROLE and LANG coordinated in defrauding the same victims.  These included victim E.P., whose interview was described above.

      b.   Most of the funds coming into WFB Account 0565 were cash deposits totaling $480,857 from June 2014 to June 2016.  I have not yet identified the source of these cash funds, although several victims in this timeframe including E.P. and J.N. described mailing cash to the mailboxes associated with the Telemarketing Companies.

      c.   From January 2016 to April 2016, WFB Account 0565 also received $46,848 in "E-Deposits" transactions from various WFB branch offices in Studio City, CA and a branch office in Toluca Lake, CA.  Based on information gained from the investigation to date, these funds were likely wired by FAROLE due to his proximity to the Laurel Canyon Boulevard Mailbox, 11012 Ventura Boulevard Mailbox, Laurelwood Drive Address, which are all located in Studio City, CA.

172. LANG subsequently used the proceeds in WFB Account 0565 to make payments for his personal expenses and purchases, such as extensive home remodeling, multiple vehicle purchases, and credit card bills.

173. On June 16, 2016, WFB Account 0565 was closed.

2.   From 2018 to 2019, FAROLE Cashed Checks Mailed by
     Victims at a Check Cashing Business

174. After the Premier Marketing accounts were closed by
the banks, FAROLE turned to cashing victim checks at the Sherman
Oaks Check Cashing business, located at 15030 Ventura Boulevard,
Suite 20, Sherman Oaks, California 91403 (the "Sherman Oaks
Check Cashing Business"), which I saw during a visit on March 3,
2021, was in the same strip mall as the 15030 Ventura Boulevard
Mailbox.

175. I know the following based on my review of a Los
Angeles Sheriff's Department ("LASD") report, my conversations
with an IRS-CI agent, and my review of documents provided by the
check cashing business.

176. On March 26, 2019, an LASD investigator interviewed
the owner of the Sherman Oaks Check Cashing Business and showed
him checks written by victim J.N.  The owner said that J.N.'s
checks were cashed by a man named Michael Anthony Le Fleur, who
said he changed his name from Michael Anthony Farole.

177. Based on my review of the driver's licenses for
Michael Le Fleur and Michael Farole that the LASD investigator
obtained from the Sherman Oaks Check Cashing Business, both
contained the same photo of a white male with same date of birth
and physical descriptions.  I determined they both depicted
FAROLE.

178. The store owner also provided LASD investigators
copies of Commercial Check Cashing Applications completed by
FAROLE for Premier Marketing and Paramount Media.

a.    On March 12, 2018, FAROLE, using the Le Fleur Identity, filed a Commercial Check Cashing Application for Premier Marketing.

b.    On July 19, 2018, FAROLE, using the Le Fleur Identity, filed a Commercial Check Cashing Application for Paramount Media.

179. On December 10, 2020, an IRS-CI Special Agent obtained copies of the checks cashed by FAROLE at the Sherman Oaks Check Cashing Business.

180. From March 2018 to December 2019, FAROLE cashed a total of $808,764 in checks received from at least 37 victims across multiple states.  The checks were payable to Premier Marketing and Paramount Media.

181. As described above, checks belonging to known victims J.N. (total $58,100), E.P. (total $17,000), and D.A. ($6,800) were cashed by FAROLE at the Sherman Oaks Check Cashing Business.

182. On January 13, 2021, a manager at the Sherman Oaks Check Cashing Business advised an IRS-CI Special Agent that on January 12, 2021, FAROLE returned to the store after a one-year absence to cash another cashier's check.  FAROLE said that he had not been working due to the COVID-19 pandemic, but now he was back.

3.    <u>From 2019 to 2023, the Conspirators Took Victim Payments Electronically</u>

183. As the fraudulent scheme progressed, the Conspirators switched to processing victim payments electronically.

According to victims, FAROLE and LANG would follow up their calls with electronic invoices sent to the victims' email addresses, which the victims fulfilled.

      *a.    FAROLE Operated Two Stripe Accounts for Paramount Media*

184. Based on my training, experience, and information on the company's website, Stripe is an online payment processing platform that allows businesses to accept online payments from customers.  Once a customer provides their payment information (e.g., credit card number) for a transaction, Stripe encrypts the customer's payment information and sends it to the acquirer, which is a bank that will process the transaction on the merchant's behalf.  If the transaction is approved, Stripe sends the funds to the merchant's bank account.

185. As detailed below, victims said that after phone calls from the Conspirators, they received Stripe invoices via email that requested payments to the Telemarketing Companies.  The victims clicked on the links in the invoices to make the payments via their credit or debit cards or bank accounts.

186. According to Stripe records, FAROLE opened two Stripe accounts for Paramount Media:

      a.    On July 31, 2019, FAROLE opened a Stripe account ending in xKkc for Paramount Media ("Stripe Account xKkc") using Farole Email 3 from Farole Vantage IP.  FAROLE identified himself as the company representative and provided Farole 2199 Number as the company phone number and the 15030 Ventura Boulevard Mailbox as the company address.  According to Stripe

IP logs, Stripe Account xKkc was accessed from Farole Email 1 between April 14, 2022, and May 19, 2022.

      b.   On February 1, 2020, FAROLE opened a second Stripe account ending in tZAz for Paramount Media using dreadlox21@aol.com from Farole Vantage IP.

187. Between August 2019 and January 2023, at least $1.7 million in payments went to the Paramount Media Stripe accounts. Based on my training, experience, and knowledge of this investigation, the vast majority of these funds appear to be payments from victims based on the following:

      a.   According to the email addresses tied to the transactions, these payments came from 80 individuals often on recurring basis.  As detailed below, many of these payments were from known victims, including B.C., L.W., and R.S.

      b.   In addition, many of the email addresses tied to the Stripe payments match those in Signeasy and DocuSign records.

188. FAROLE made Chase Account 0683 the merchant bank for both Paramount Media Stripe accounts from February 2020 to September 2022.  According to Chase records, Chase Account 0683 received at least $1.7 million in proceeds from payments made to both Stripe accounts in that timeframe.

189. In September 2022, FAROLE switched the merchant bank for both Stripe accounts to BOA Account 7022.  According to BOA records, approximately $1 million in payments went to BOA Account 7022 from the Paramount Media Stripe accounts between September 2022 and April 2023.

> b.    *Victim Funds from Stripe Went to Chase Account 0683*

190. On July 2, 2018, FAROLE opened Chase Account 0683 in the name of Paramount Media.  FAROLE was the sole signatory and provided the Farole 0192 Number and the Laurelwood Drive Address.

191. Between July 2018 and September 2022, Chase Account received a total of approximately $2.4 million in deposits from the following sources:

a.    As detailed above, the majority of the funds, at least $1.7 million, came from the Paramount Media Stripe accounts which processed victim payments.

b.    Chase Account 0683 also received a total of approximately $276,963 from other electronic payment platforms, including GET, EMS, and EPX, which FAROLE was likely employing in a similar manner to Stripe.

c.    FAROLE deposited checks into Chase Account 0683 from possible victims totaling approximately $94,000 between March 2018 and September 2022.  These included checks from known victims L.W., S.K., and J.B.

d.    From August 2018 to September 2022, Chase Account 8667 received cash deposits that totaled $111,841.

192. FAROLE spent the money as it came in:

a.    FAROLE paid LANG over $500,000 from November 16, 2018, to August 29, 2022, through Zelle, an electronic funds transfer platform operated by Chase.  These funds went to Chase Account 8667.

b.    FAROLE spent directly from Chase Account 0683 on personal purchases, through checks, wire transfers, or debit card.  For example:

i.    FAROLE purchased Cartier jewelry totaling approximately $75,000.

ii.    FAROLE purchased Louis Vuitton products totaling approximately $27,571.

iii. FAROLE made total purchases from Amazon market in the amount of $127,416.

iv.    FAROLE purchased items from Best Buy, in the total amount of $23,701.

v.    On September 15, 2020, FAROLE purchased a pump action shot gun from Burbank Ammo & Guns, for a total price of $1,983.

c.    FAROLE paid a total of $16,500 in rent on his prior residence, the Vantage Avenue Address, in 2020 and a total of $57,200 in rent on **SUBJECT PREMISES 1** from June 2022 to September 2022.

d.    In September 2022, Chase closed Chase Account 0683 due to suspected fraudulent activity.

c.    *Funds from the Stripe Payments Went to BoA Account 7022*

193. On August 18, 2022, FAROLE opened BOA Account 7022, a business checking account, and BOA Account 7035, a business savings account, in the name of Paramount Media.

194. In September 2022, FAROLE changed the merchant bank for the Paramount Media Stripe accounts to BOA Account 7022,

meaning that victim funds received by Stripe would go to that account.  From September 2022 to April 2023, a total of approximately $1 million came into BOA Account 7022 from Stripe.

195. Stripe disbursements, aka, victim funds, made up the vast majority of the approximately $1.24 million in total deposits coming into BOA Account 7022 from September 2022 to April 2023.  Additional suspected victim proceeds came from GET and EMS electronic payments and one-off check deposits.

196. As with the prior accounts, FAROLE paid LANG via Zelle.  FAROLE sent a total of $86,326.52 to LANG from September 2022 to April 2023, which funds went to Chase Account 8667.

197. According to law enforcement databases, in February 2023, FAROLE went on a trip to Europe with S.A. using a U.S. passport that he had recently acquired.  According to law enforcement databases, FAROLE had not been able to get a passport because of an outstanding IRS debt described below. The expenses for FAROLE's trip came directly out of BOA 7022:

     a.    FAROLE paid approximately $14,605.70 for two tickets to Delta Air on January 9, 2023.

     b.    FAROLE spent approximately $13,316.82 at Prada in Italy on February 6, 2023.

     c.    FAROLE paid approximately $12,772.26 for a Four Seasons Hotel in Firenze, Italy on February 15, 2023.

     d.    FAROLE spent approximately $6,392.25 at Galeries Lafayette Paris Haussmann, a luxury department store, on February 21, 2023.

198. The disbursements from BOA Account 7022 were directed almost entirely to personal purchases for FAROLE, such as:

    a.    FAROLE spent approximately $37,124.50 at Cartier, including a $26,937 purchase on October 24, 2022, at a store in Topanga, CA.

    b.    FAROLE spent approximately $10,733.59 at Louis Vuitton.

    c.    FAROLE paid approximately $11,768.71 to Mercedes-Benz.

    d.    FAROLE spent approximately $45,719.75 on Amazon from September 2022 to April 2023.

199. From BOA Account 7022, FAROLE also paid rent on **SUBJECT PREMISES 1** totaling $91,000 from October 2022 to April 2023.

    4.    <u>LANG Spent Victim Funds from Chase Account 8667</u>

200. LANG opened Chase Account 8667 on May 16, 2016, in his own name as the sole signatory, which was addressed to the Goose Cross Address.

201. Chase Account 8667 received over $1.5 million in deposits from May 2016 to February 2023.  As described above, most funds coming into Chase Account 8667 appear to be victim proceeds directly from the Telemarketing Companies' accounts controlled by FAROLE:

    a.    LANG deposited approximately $148,890 in checks from Premier Marketing, from April 28, 2017, to February 9, 2018.  These funds came from FRB Account 3897.

b.    From June 2016 to January 2020, LANG deposited approximately $107,908 in WFB cashier's checks from Dissonance Entertainment.  These funds came from WFB Account 9856.

c.    From March 12, 2018, to August 23, 2019, LANG deposited approximately $245,978 in money order checks that were purchased from Continental Express Money Order Company, Inc in Santa Ana, CA.  Based on my knowledge of the investigation, I believe these checks were purchased by FAROLE because many of the checks referenced FAROLE, Premier Marketing, and victim names.  In this timeframe, the funds likely came from victim checks deposited by FAROLE at the Sherman Oaks Check Cashing Business.

d.    LANG received Zelle payments and cashiers checks from Paramount Media, which totaled approximately $622,219.29, from March 2, 2020, to April 28, 2023.  These funds came from Chase Account 0683 and BOA 7022.

202. During the period from June 1, 2016, to April 20, 2017, LANG received $207,619 in checks and wire payments from Condo Rental Associates.  These came from a Condo Rental Associates BOA account ending in 0203 ("BOA Account 0203"), controlled by Th.M.  I have reason to believe that Condo Rental Associates is related to the fraudulent scheme because several victims called by FAROLE and LANG recounted sending money to and provided paperwork relating to Condo Rental Associates, and DocuSign provided records showing that hundreds of documents were sent electronically to known victims from an email address

associated with Condo Rental Associates and with file names related to Condo Rental Associates.

203. There were no reasonable business expenses related to timeshare services apparent in Chase Account 8667. As did FAROLE, LANG used the proceeds in Chase Account 8667 for self-enrichment, such as:

a.   A $12,000 down payment on a 2015 Jeep Wrangler Unlimited bearing VIN 1C4HJWDG1FL701289, on November 16, 2018;

b.   $25,500 to R.H. for the purchase of a 1971 Chevrolet C10 bearing VIN CS141B615365 on April 6, 2020;

c.   $10,197 to Action Powersports to finance the purchase of a 2019 Can-Am Model 9NKE off-road vehicle bearing VIN 3JBVANW25KK002492, on August 18, 2020;

d.   $14,009.40 to Midwest Trailer Depot to finance the purchase of a 2022 Haulmark trailer bearing VIN 7KB1E2026NT901451 on November 3, 2021;

e.   $40,000 down payment on a 2022 Fleetwood Discovery 38N RV bearing VIN 4UZACGFC7NCNY4887 on April 11, 2022;

f.   Mortgage payments totaling $37,694.34 from September 20, 2019 through April 1, 2021, for Lang Residence;

g.   Payments to Doerflers Harley Davidson, which totaled $128,167.33 from April 13, 2017, to March 30, 2020;

h.   $27,287.50 down payment on a 2018 TIGE Boat, and monthly loan payments on the financed portion;

i.   $12,895.84 for expenses related to a wedding on April 13, 2019; and

j.    AMEX credit card payments, which totaled $79,728.39.

### J.    FAROLE Evaded the Payment of Taxes and Filed an Offer in Compromise with the IRS That Contained False Statements

204. During 2016, FAROLE was the subject of a civil IRS audit which resulted in approximately $390,000 additional tax due for 2008, 2009, 2010, 2011, 2013, and 2014.

205. At the culmination of the audit, FAROLE signed tax returns for the above years acknowledging the IRS auditor's findings.  With penalties and interest, FAROLE's has been assessed a tax balance of approximately $640,000.

206. FAROLE took multiple steps to conceal his assets and income from the IRS.

a.    FAROLE did not file any income tax returns for the years 2016 through 2022 despite depositing over $3 million in proceeds from his telemarketing timeshare scheme.  During this time FAROLE did not make any payments toward his tax liability.

b.    FAROLE used nominee bank accounts such as Premier Marketing and Paramount Media to deposit his income and pay his personal expenses.

c.    FAROLE used a check cashing business to cash checks from victims totaling over $800,000 during 2018 and 2019.

d.    Finally, FAROLE filed an Offer in Compromise in 2022 and misled the IRS about his income and assets.

207. Based on my training and experience and my conversations with other law enforcement agents, I know that an

Offer in Compromise, Form 656, is essentially a request to the IRS to settle an existing tax liability for less than the full amount.

208. On November 15, 2022, the IRS received an Offer in Compromise that was signed by FAROLE on August 24, 2022, which I have reviewed.

209. FAROLE declared under penalty of perjury that the offer, including accompanying schedules and statements, was true, correct, and complete.

210. FAROLE provided the 0192 Number as his phone number and permanent address as 12807 Jacob Grace Court, Wind[er]mere, Florida 34786.

211. The Offer made by FAROLE purported to cover tax years 2008, 2009, 2010, 2011, 2013, and 2014, which are the years of the audit previously described.

212. FAROLE claimed that he did not have enough in assets and income to pay the full amount of tax liability, which was $645,467.31.  FAROLE offered to pay a lump sum that totaled $1,000.  In response to "tell us where you will obtain the funds to pay your offer," FAROLE responded, "Taxpayer will borrow the funds from friends or family if ne[c]essary."

213. On the accompanying Form 433-A (OIC), in support of the offer, FAROLE claimed that he was unemployed and that his only personal asset was $1,000 in cash.  FAROLE also claimed that he had no business assets and no income.

      a.   However, Chase bank records show that during August 2022, FAROLE deposited $105,000, including victim proceeds, into Chase Paramount Media Account No. 0683.

      b.   On August 29, 2022, shortly after signing the Offer in Compromise, FAROLE deposited $4,300 in cash into Chase Paramount Media Account No. 0683.

214. FAROLE also made lavish purchases for apparent luxury items during August 2022 including two purchases at Louis Vuitton totaling approximately $3,500 and Prada for approximately $1,000.  On August 15, 2022, FAROLE made jewelry purchases at Cartier for $6,000.

215. From the time of the IRS audit to the filing of the Offer in Compromise, FAROLE made no payments toward his tax liability and filed no tax returns despite depositing over $2.5 million during a period of approximately five years in proceeds from his timeshare telemarketing scheme.

**K.    Investigation of the SUBJECT PREMISES and SUBJECT VEHICLES**

216. Based on public domain and California DMV records, bank records, my conversations with law enforcement agents, and physical surveillance, I believe that FAROLE currently resides at **SUBJECT PREMISES 1**, rents **SUBJECT PREMISES 2** and **SUBJECT PREMISES 3**, and owns the **SUBJECT VEHICLES**.

1.   FAROLE Receives Mail at SUBJECT PREMISES 1

217. On July 20, 2022, an IRS-CI Special Agent visited the Mississippi Avenue Address, which is a new three-story condo building.  The agent searched the trash at **SUBJECT PREMISES 1**.

The agent found one Amazon mail envelope that was addressed to "Michael Dragunov" at **SUBJECT PREMISES 1**.  The agent also found a purchase receipt from a Subway sandwich shop that showed that it was "for Michael," which is FAROLE's first name.

2.    Bank Accounts Controlled by FAROLE Were Used to Pay Rent at SUBJECT PREMISES 1

218. As detailed above, according to Chase records, Chase Account 0683 paid rent for **SUBJECT PREMISES 1** from June 2022 to September 2022.

219. According to BOA records, BOA Account 7022 paid rent for **SUBJECT PREMISES 1** from November 2022 to April 2023.

3.    Physical Surveillance Confirmed That FAROLE Lives at SUBJECT PREMISES 1 and Drives the SUBJECT VEHICLES

220. On December 21, 2022, at 10:29 am, an FBI Special Agent observed a female departing from **SUBJECT PREMISES 1** driving in a black Audi SUV bearing California license plate number 8MBB188.  According to California DMV records, the Audi SUV is registered to S.A., who is believed to be his fiancé based on public posts on the Dragunov Instagram.

221. On December 22, 2022, at 8:35 am, an FBI Special Agent observed FAROLE and S.A. returning to **SUBJECT PREMISES 1** in **SUBJECT VEHICLE 1**.  According to California DMV records, **SUBJECT VEHICLE 1** is registered to FAROLE.

222. On June 23, 2023, FBI Special Agents saw **SUBJECT VEHICLE 1**, **SUBJECT VEHICLE 2**, and **SUBJECT VEHICLE 3** parked in the back of **SUJBECT PREMISES 1**.  According to California DMV records, **SUBJECT VEHICLE 2** is registered to FAROLE and S.A. at

**SUBJECT PREMISES 1**, and **SUBJECT VEHICLE 3** is registered to FAROLE at a prior address.

    4.    <u>Phone Location Information Places FAROLE at SUBJECT PREMISES 1</u>

223. As detailed above, GPS location data provided by Verizon for the Farole 0192 Number placed FAROLE at or near **SUBJECT PREMISES 1** on regular basis from March 2023 through as recently as June 26, 2023.

    5.    <u>FAROLE Rents SUBJECT PREMISES 2 and SUBJECT PREMISES 3</u>

224. According to records provided by Public Storage, FAROLE signed a rental agreement for **SUBJECT PREMISES 2** on April 19, 2022.  FAROLE provided **SUBJECT PREMISES 1** as his address, Farole 0192 Number as his phone number.  Public Storage records received on June 27, 2023, confirm that FAROLE still rents **SUBJECT PREMISES 2** as of that date.

225. According to Public Storage, Chase, and BOA records, FAROLE used a debit card tied to Chase Account 8667 to pay the monthly rental fees on **SUBJECT PREMISES 2** from April 2022 to September 2022 and a debit card tied to BOA Account 7022 to pay the rental fees from October 2022 to April 2023.

226. According to Public Storage records, FAROLE, under the Dragunov Identity, signed a rental agreement for **SUBJECT PREMISES 3** on June 22, 2023.  FAROLE provided **SUBJECT PREMISES 1** as his address and Farole 0192 Number as his phone number.

    V.    <u>REQUEST FOR NIGHT SERVICE</u>

227. Based on FAROLE's movement patterns from the Verizon GPS location data for Farole 0192 Number, reasonable cause

exists to permit the execution of the requested search warrants at any time in the day or night.

228. Specifically, the recent GPS location data shows that FAROLE often leaves **SUBJECT PREMISES 1** in the early hours of the morning, before 6:00 a.m. For example:

a. On June 9, 2023, FAROLE's movement started at 4:35 a.m. PDT. It appears that FAROLE arrived at a Gold's Gym in Venice ("Gold's Gym") at 6:05 a.m.

b. On June 10, 2023, FAROLE's movement started at 5:34 a.m.

c. On June 12, 2023, FAROLE's movement started at 4:18 a.m.

d. On June 15, 2023, FAROLE's movement started at 5:19 a.m.

e. On June 21, 2023, FAROLE was at Gold's Gym by 5:57 a.m.

f. On June 22, 2023, FAROLE's movement began on 4:42 a.m. FAROLE arrived at Gold's Gym at 6:27 a.m.

229. For the safety of the agents, especially given the fact that FAROLE appears to own a shotgun registered to him, it is important to execute the search warrants and arrest warrant while FAROLE is still at **SUBJECT PREMISES 1** rather than an unpredictable location. Thus, I am requesting permission to execute the requested warrants at any time in the day or night.

## VI.  TRAINING AND EXPERIENCE ON FRAUD AND MONEY LAUNDERING

230. In addition to the foregoing facts, I have learned during my tenure as an FBI agent that individuals involved in

complex fraud schemes, such as wire fraud and money laundering, often use computers, cellular telephones, and mobile "smart phones" to conduct their fraudulent transactions.  For example, such individuals often use computers, cellular telephones, and mobile smart phones to conduct online banking, the records of which may be stored on digital devices rather than paper records.

231. I also know that persons who carry out complex fraud schemes may use computers, cellular telephones, and mobile smart phones to communicate with potential or actual victims.  As discussed above, FAROLE and LANG used Microsoft Skype to call victims, meaning that these calls necessarily took place from digital devices.

232. Based on my training and experience, individuals involved in complex financial crimes, such as wire fraud and money laundering, often use USB storage devices (commonly referred to as thumb-drives or memory sticks) and external hard drives to store financial records, including banking records and statements, other financial account records, checks, balances, transactions, records of purchases, records reflecting the transfer of assets, and records which are maintained, stored, and utilized to conduct online banking activities.  Such information is easily transmitted to and from electronic storage devices, such as USB drives and external hard drives without ever printing or maintaining a paper or printed record and in lieu of receiving such records via regular U.S. mail or domestic mail services.  In this investigation, I know that the

Telemarketing Companies sent emails to victims containing electronic invoices, receipts, and agreements.

233. Based on my training and conversations with other law enforcement agents who have investigated complex fraud schemes, I know that individuals who engage in such schemes often keep records of their fraudulent activities, including financial records, fraudulent documents, and electronic communications, on computers, USB drives, external hard drives, servers, or other digital devices for years after the fraudulent scheme has been completed.

234. Based on my training, experience, and conversations with other law enforcement agents who have investigated complex fraudulent schemes, I know that businesses and self-employed individuals commonly maintain paper records like bank statements, wire records, receipts, expense reports, ledgers, balance sheets, income statements, stockholder records, investment agreements, pitch materials and other financial documents commonly used in fraudulent schemes on their premises.

## VII. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[10]

235. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

---

[10] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

236. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

237. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VIII.     CONCLUSION

238. For all of the reasons described above, there is probable cause to believe that FAROLE and LANG have committed a violation of Title 18, United States Code, Section 1349.  There is also probable cause that the items to be seized described in Attachment B will be found in a search of SUBJECT PREMISES 1 described in Attachment A-1, SUBJECT PREMISES 2 and SUBJECT PREMISES 3 described in Attachment A-2, SUBJECT VEHICLE 1 described in Attachment A-3, SUBJECT VEHICLE 2 described in Attachment A-4, SUBJECT VEHICLE 3 described in Attachment A-5, and the person of FAROLE described in Attachment A-6.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 27 day of
June, 2023.

_____
UNITED STATES MAGISTRATE JUDGE